IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LORENZO HARRISON,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Civil Action No. 1:25-cv-877 (RDA/IDD)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
PETE HEGSETH, Secretary,⠀⠀⠀⠀⠀)
Department of Defense,[1]⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀⠀⠀⠀)
_____)

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant's Motion to Dismiss ("Motion") the Amended Complaint filed by Plaintiff Lorenzo Harrison ("Plaintiff"). Dkt. 44. This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Having considered the Motion together with Defendant's Memorandum in Support (Dkt. 48), Plaintiff's Opposition (Dkt. 50), and Defendant's Reply (Dkt. 52), this Court GRANTS-IN-PART and DENIES-IN-PART the Motion for the reasons that follow.

### I. BACKGROUND[2]

#### A. Factual Background

Plaintiff, an African American man, brings four counts in this First Amended Complaint (the "FAC") against the United States Department of Defense for discrimination on the basis of race,

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Pete Hegseth has been substituted for Lloyd J. Austin III.

[2] For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within the First Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

retaliation, hostile work environment, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").  Dkt 44.  Plaintiff has been employed by the federal government in some capacity for 22 years.  *Id.* ¶ 21.[3]

Plaintiff has submitted a number of EEO complaints against his supervisors Stanley Newell and Eston Presnell (collectively, the "Supervisors").  *Id.* ¶ 24.  In 2016, Plaintiff filed an EEO complaint alleging race discrimination, after he was warned that Newell had a personal animus against him and after Plaintiff was passed over for deployment opportunities.  *Id.*  In 2019, Plaintiff filed an EEO complaint alleging race discrimination and retaliation by the Supervisors and others after he was denied deployment and stateside career advancement.  *Id.*  In 2020, Plaintiff filed an EEO complaint alleging that his Supervisors attempted to circumvent his agreed 6–12-month Regional Director of Investigations ("RDI") deployment by offering only a 90-day deployment.  *Id.*  In April 2021, Plaintiff filed an EEO complaint alleging disparate treatment, discrimination, and retaliation against his Supervisors while serving as RDI in Kuwait.  *Id.*  In October 2021, Plaintiff filed an EEO complaint alleging discrimination, retaliation, hostile work environment, and constructive termination against his Supervisors and others.  *Id.*

In January 2020, Newell required Plaintiff to re-complete deployment training prior to being eligible to re-deploy for 6-12 months or as the RDI.  *Id.* ¶ 28.  During training, a transnational deployment instructor, Robert Eubank, used the n-word to Plaintiff's face.  *Id.*

In September 2020, the Supervisors extended the deployment of the current RDI, Matthew Day (who is white), and offered Plaintiff only a 90-day deployment.  *Id.* ¶ 29.  Plaintiff had previously complained about this situation and noted that "[i]t seems as though, either my race or a previous

---

[3] The FAC is at times rambling and fails to follow a chronological progression, even though Plaintiff is represented by counsel.  The Court has attempted to organize Plaintiff's allegations, but, at times, in order to remain true to the FAC, matters may appear out of chronological order.

2

complaint is prohibiting me from receiving fair treatment." *Id.* ¶ 30.  On September 15, 2020, Plaintiff was offered the RDI position for the March 2021 Transnational DCIS deployment.  *Id.* ¶ 32.

On October 10, 2020, Plaintiff was subjected to an interrogation by two agents regarding an alleged relationship with a female who was the subject of an ongoing investigation.  *Id.* ¶ 33.

From February 21, 2021, until June 9, 2021, Plaintiff deployed and was stationed at Camp Arifjan in Kuwait.  *Id.* ¶ 34.  As far as Plaintiff is aware, he was the first and only African American RDI.  *Id.*

While the RDI in Kuwait, Plaintiff was denied access to the designated RDI workspace, which previous RDIs, (Day, Dan Hald, and Presnell – who are all Caucasian) had been permitted to use.  *Id.* ¶ 36.  The Supervisors did not permit Plaintiff to stay in the operations suite, even though such decision would ordinarily rest with Mission Support Team Staff Ernest Solomon.  *Id.*  Instead, Plaintiff was assigned a room with no bed linen, with known plumbing issues and no resources.  *Id.*  Presnell also left his personal belongings in the RDI suite in violation of DoD policy.  *Id.* ¶ 37.

As RDI, Plaintiff asserts that he was excluded from participating in the personnel decision-making process related to agent deployments – a core function of his position.  *Id.* ¶ 39.  Day and Newell both participated in deployment selection call, but Plaintiff was excluded from such decision-making.  *Id.*  Plaintiff further alleges that he was not permitted the same freedom of movement as other RDIs.  *Id.* ¶ 42.  Plaintiff asserts that the Supervisors implemented new policies solely to burden Plaintiff.  *Id.* ¶ 43.

Plaintiff alleges that, upon his return to the United States, Plaintiff was excluded from even non-classified access and information, which undermined Plaintiff's ability to perform his job.  *Id.* ¶ 51.

When Plaintiff traveled to Bahrain sometime later, during the COVID-19 pandemic, Newell required him to book a hotel and rental car.  *Id.* ¶ 53.  This was unnecessary because of Qatari restrictions, including a mandatory quarantine, which resulted in waste.  *Id.*  After Plaintiff had

travelled to Bahrain, pursuant to Presnell's instructions, Newell asserted that Plaintiff lacked the required permission to travel. *Id.* ¶ 54.

Plaintiff also asserts that, after he accepted his RDI appointment, the Supervisors pressured Plaintiff to relocate his duty station from Kuwait to Al Udeid Air Base in Qatar. *Id.* ¶ 60. Plaintiff alleges that the conditions at Al Udeid were notoriously deplorable and that DoD had tried to move its agents out of Al Udeid because of those conditions. *Id.* Nonetheless, the Supervisors attempted to forcibly transfer Plaintiff. *Id.*

On June 1, 2021, Plaintiff called Assistant Inspector General for Investigations Karen Spidell to discuss options if he decided to end his deployment early. *Id.* ¶ 62. Plaintiff was told that a Program Director for Regional Operations had been filled and that he could not return to his Program Manager role. *Id.* Plaintiff then experienced a panic attack and reported it to Spidell relating it to the alleged discrimination and retaliation from the Supervisors. *Id.* ¶ 63.

On June 8, 2021, Plaintiff requested sick leave, which was not approved. *Id.* ¶ 65. Plaintiff then experienced a medical incident and was required to stay in the hospital. *Id.* Plaintiff again requested sick leave and his request went unanswered. *Id.* Between June 8 and July 21, 2021, Plaintiff made multiple requests for sick leave, which went ignored. *Id.* ¶ 66. Plaintiff then requested leave under the Family and Medical Leave Act (the "FMLA"). *Id.* ¶ 67. Defendant still did not approve these requests. *Id.*

On June 10, 2021, Plaintiff was compelled to return to the United States, which resulted in the loss of his RDI position and a demotion. *Id.* ¶ 73. Upon his return, Plaintiff remained under the supervision of the Supervisors against whom he had made his EEO complaints. *Id.* ¶ 74.

Ultimately, instead of granting Plaintiff's sick leave requests, Defendant placed Plaintiff on "administrative leave" and required daily "check-in" phone calls. *Id.* ¶ 77. The status was related to an alleged incident in Kuwait of which Plaintiff was never informed. *Id.* ¶ 78.

On July 2, 2021, Defendant subjected Plaintiff to a "fit for duty" evaluation. *Id.* ¶ 72.

On July 21, 2021, Plaintiff resigned. *Id.* ¶ 82. Plaintiff subsequently attempted to withdraw his resignation but was not permitted. *Id.* ¶ 83.

## B. Procedural Background

Plaintiff originally filed his Complaint in the District Court for the District of Columbia. Dkt. 1. The case was subsequently transferred to this District. Dks. 21, 22, 23. On June 6, 2025, this Court set a briefing schedule. Dkt. 27. After Defendant filed a motion to dismiss, Plaintiff filed his Amended Complaint on August 20, 2025. Dkt. 44. Defendant filed his Motion on September 12, 2025. Dkt 47. Plaintiff opposed the Motion on September 26, 2025. Dkt. 50. Defendant replied on October 1, 2025. Dkt. 52.

## II. STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion, *see Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir.

5

2015), but they "may consider documents . . . attached to the motion to dismiss, as long as they are integral to the complaint and authentic[,]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## III. ANALYSIS

Plaintiff asserts four claims against Defendant under Title VII: race discrimination, retaliation, hostile work environment, and constructive discharge. Dkt 44. Defendant seeks to dismiss all counts. Dkt. 47. The Court will address each argument in turn.

### A. Hostile Work Environment

Plaintiff bases his hostile work environment claim on both his race and his protected activities. Dkt. 44 ¶¶ 98-105. He also asserts that his interaction with Eubank alone is sufficient to establish a hostile work environment. The Court will address each argument.

To begin with, the Court considers the allegation that Eubank used the "n-word" towards Plaintiff. Dkt. 44 ¶ 28. The use of such a slur is odious, racist, and unacceptable in the workplace. Plaintiff does not allege, however, that he ever had any interaction with Eubank again, that he informed his Supervisors about Eubank's use of this slur, or that Eubank acted at the direction of any of Plaintiff's Supervisors when he used such language. The Court certainly agrees that the single usage of such an epithet can create a hostile work environment because it is clearly antagonistic and race-based. In these circumstances, the Court notes that the offensive word was used by someone not directly supervising Plaintiff, who did not have further interaction with Plaintiff, and which the slur occurred more than one year before the claims at issue here arose. This isolated incident, dreadful as it is, is too remote and too disconnected from his employer to support a hostile work environment claim here. *See Belton v. City of Charlotte*, 175 F. App'x 641, 657 (4th Cir. 2006) (holding that use of n-word could not sustain a hostile work environment claim where it was too remote); *Washington v. Kroger Ltd. P'Ship*, 2012 WL 6026138, at *7 (W.D. Va. Dec. 4, 2012) (discussing precedent holding that isolated uses of epithets remote in time are insufficient to establish a hostile work environment).

6

Further, Plaintiff has alleged that the Supervisors in the instant matter were his supervisors and does not allege that Eubank was a supervisor such that his conduct would be imputable to Defendant. *See Bullard v. Panasonic Corp. of N. Am.*, 418 F. Supp. 2d 802, 813 (E.D. Va. 2006).

Turning to the allegations of a hostile work environment lodged against the Supervisors, Plaintiff must allege sufficient facts to show that the alleged conduct was: (1) unwelcome; (2) based on a protected characteristic; (3) sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive work environment; and (4) imputable to his employer. *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495–96 (4th Cir. 2015). Stated differently, a plaintiff must plausibly plead that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). There is no precise formula for determining whether a work environment is "abusive" or "hostile"; such a determination can be made "only by looking at all the circumstances." *Id.* at 23.

To the extent that Plaintiff attempts to state a race-based hostile work environment, Plaintiff fails to connect any of the actions of the Supervisors to his race. He does not allege that they made any comments regarding his race and, indeed, Plaintiff affirmatively alleges that he has been told that "Newell harbored personal animus toward" him. Dkt. 44 ¶ 24(1). Although Plaintiff attempts to rely on Day, Hald, and Presnell as comparators, Plaintiff fails to allege sufficient information to demonstrate that they were similarly situated in all material respects. *See Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). Indeed, Presnell was Plaintiff's supervisor, so they were not similarly situated in that respect. Nor is there an allegation that Day or Hald were facing the same circumstances during their own deployments (which would have at least been temporally unrelated) or that they faced the same supervisors or decisionmakers. Accordingly, with nothing directly connecting Plaintiff's race

7

to any of the conduct that he faced, Plaintiff has failed to establish that there was a race-based hostile work environment.

Plaintiff fares no better with respect to his retaliatory hostile work environment claim. Although Plaintiff asserts that he emailed several individuals – including Newell – specifically raising complaints about discrimination and retaliation, Plaintiff does not allege any materially adverse event until related to the Supervisors until months later.[4]  Plaintiff asserts that he emailed management, including Newell, in August 2020.  Dkt. 44 ¶ 30.  On the other hand,  the next act that Plaintiff alleges is related to the conduct of any the emailed individuals is months later in February 2021 when he arrives in Kuwait.  *Id.* ¶¶ 34, 36.  This period is enough to break any causal connection.  *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) (recognizing that there is no "bright-line rule for when temporal proximity helps or hurts a cause of action for retaliation," but that a two-month gap is "sufficiently long so as to weaken significantly the inference of causation between the two events").  Plaintiff attempts to rely on a confrontation between himself and two unidentified investigators in October 2020 to establish a continual causal chain, but there is nothing to connect that incident to any of the persons named on the email.  Dkt. 44 ¶ 33.  Plaintiff also fails to establish that his Supervisors have knowledge of any of Plaintiff's subsequent complaints as his allegations in this regard are conclusory.  Plaintiff's only allegations in this regard are that the Supervisors *must have* had knowledge because they were the subject of the complaints.  *See, e.g.*, *id.* ¶ 96 ("This is particularly true for Newell and Presnell because they were the subject of Plaintiff's 5 EEO complaints.").  Additionally, with respect to some of Plaintiff's later allegations, Plaintiff fails to allege who the relevant decisionmaker

---

[4] Plaintiff also alleges that Newell was aware of Plaintiff's June 2016 EEO complaint, Dkt. 44 ¶ 24(1), but Plaintiff does not allege any substantive and non-conclusory facts regarding what happened between that complaint and any later action that might establish continuous retaliation during that period.

was.  For example, with respect to his requests for sick leave, Plaintiff generally alleges that "*Defendant* never approved these requests," without specifying what employee was responsible.  *Id.* ¶ 69.

Because Plaintiff fails to allege sufficient facts to plausibly connect any of the conduct from which he was alleged to suffer to a protected characteristic, Plaintiff fails to establish a hostile work environment claim and this count will be dismissed.

### B. Constructive Discharge

Plaintiff asserts that he was constructively discharged both as an adverse employment action with respect to his discrimination and retaliation claims as well as a standalone claim in Count IV. Dkt. 44.  To establish constructive discharge, Plaintiff must show that (1) his working conditions became so intolerable that a reasonable person in his position would have felt compelled to resign, and (2) that he actually resigned.  *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211–12 (4th Cir. 2019) (citing *Green v. Brennan*, 578 U.S. 547, 555 (2016)).  A showing of intolerability requires "something more" than the severe or pervasive conduct that suffices for a hostile work environment claim.  *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 149 (2004)).  "Intolerability is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign," but rather, "whether a reasonable person in the employee's position would have felt *compelled* to resign."  *Perkins*, 936 F.3d at 211–12 (emphasis in original) (citations omitted).  Moreover, the objectively intolerable conditions must be connected to a protected characteristic.  *See Beasley v. Goodwin House Bailey's Crossroads*, 2019 WL 9143511, at *2 (E.D. Va. Jan. 15, 2019).

As discussed with respect to Plaintiff's hostile work environment claim, Plaintiff has not alleged facts that plausibly connect any of the Supervisors' conduct of which he complains to his race, color, or protected activities.  Indeed, as discussed *supra*, outside of Newell being copied on an August 2020 email, Plaintiff does not allege that the Supervisors had any knowledge of Plaintiff's protected

9

activities, and there is a significant period of time between Newell's knowledge of that email and any alleged adverse action. The Court need not decide at this point whether Plaintiff's circumstances *were* objectively intolerable, but, even assuming that they were, Plaintiff fails to: (i) identify the decisionmaker with respect to his leave requests; (ii) identify the decisionmaker with respect to his involuntary return to the United States; (iii) identify the decisionmaker with respect to Plaintiff's administrative leave; (iv) identify the author of the memorandum regarding the "incident" in Kuwait; or (v) identify the person to whom Plaintiff provided, and from whom Plaintiff attempted to retract, his resignation. Moreover, to the extent Plaintiff seeks to draw an adverse inference from the lateral transfer of Victor Sanguanboon, one is not immediately apparent or plausible on the facts alleged, as Sanguanboon was transferred into the Program Director position *before* Plaintiff informed Spidell that he was considering ending his deployment early. Dkt. 44 ¶ 62. Based on the information alleged the Amended Complaint, Plaintiff has not plausibly connected the conduct that he asserts was objectively intolerable to any protected trait or activity. Accordingly, this claim will be dismissed.

### C. Retaliation

"To make a *prima facie* claim of retaliation, a plaintiff must show: (1) that he engaged in protected activity, (2) that [the defendants] took a materially adverse action against him[,] and (3) [that] there is a causal connection between the protected activity and the adverse action." *Evans*, 936 F.3d at 195 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61–68 (2006)). To allege a "materially adverse action" for a Title VII retaliation claim, Plaintiff must allege that his employer took actions that would dissuade a reasonable employee from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998).

Here, Plaintiff engaged in a protected activity by filing five EEO complaints against Defendant, alleging that he was being denied deployment opportunities due to his race and prior protected activity.

10

Dkt. 44 ¶ 28.  Outside of his 2016 EEO Complaint and August 2020 email, however, Plaintiff fails to allege that the Supervisors had knowledge of any of his protected activities such that their conduct could be considered causally connected.  Moreover, to the extent that Plaintiff relies on the August 2020 email, as discussed *supra*, the next action specifically tied to the Supervisors occurred months later – breaking any temporal nexus.  *Id.* ¶¶ 34, 36; *Laurent-Workman*, 54 F.4th at 219 (recognizing that there is no "bright-line rule for when temporal proximity helps or hurts a cause of action for retaliation," but that a two-month gap is "sufficiently long so as to weaken significantly the inference of causation between the two events").  Moreover, as discussed *supra*, with respect to many of the later alleged adverse actions, Plaintiff does not even identify the relevant decisionmaker to allow the Court to make any reasonable determination regarding whether that decisionmaker was influenced by the existence of a protected activity.   Accordingly, Plaintiff's retaliation claim fails.

### D. Race Discrimination

To establish discrimination on the basis of race absent direct evidence of discrimination, Plaintiff must allege (1) that he is a member of a protected class, (2) that he performed his job satisfactorily, (3) that he was subject to adverse employment action, and (4) that he was treated differently from similarly situated employees outside of his protected class.  *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *Cosby v. S.C. Prob.*, *Parole & Pardon Servs.*, 93 F.4th 707 (4th Cir. 2024).  To survive a motion to dismiss under Title VII, plaintiffs do not need to plead a *prima facie* case.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002).  However, plaintiffs must "allege facts to satisfy the elements of a cause of action created by that statute."  *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015).  This means plaintiffs must allege facts that plausibly state a violation of Title VII "above a speculative level."  *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020).

Here, the parties focus first on what qualifies as an adverse employment action for purposes of Title VII claim in the federal sector.  In this regard, the parties disagree regarding the import of the

11

Supreme Court's decision in *Babb v. Wilkie*, 589 U.S. 399 (2020), in which the Supreme Court held that the Age Discrimination in Employment Act's (the "ADEA") language authorizing liability for "personnel actions" was made with reference to the list of actions in the Civil Service Reform Act (the "CSRA"). *Id.* at 405. Because Title VII's federal-sector provision uses the same language, Defendant argues that adverse employment actions for federal employees should be similarly confined to personnel actions.

The Fourth Circuit has yet to address whether *Babb* applies to Title VII cases. Two Courts of Appeals – the Seventh and Eleventh Circuits – have both concluded that *Babb* does apply. *See See Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1199–200 (11th Cir. 2021) ("Because the relevant statutory provisions of the ADEA and Title VII are essentially identical, the *Babb* Court's interpretation of the ADEA's phrase 'personnel actions . . . shall be made free from any discrimination based on' must control here, too."); *Huff v. Buttigieg*, 42 F.4th 638, 645 (7th Cir. 2022) ("The federal-sector provisions in the ADEA and Title VII are identical, so we have no trouble concluding, as did the Eleventh Circuit, that Babb's causation standard applies equally to 42 U.S.C. § 2000e-16."); *see also Babb*, 589 U.S. at 419 (Thomas, J., dissenting) ("Because § 633a(a)'s language also appears in the federal-sector provision of Title VII, 42 U.S.C. § 2000e–16(a), the Court's rule presumably applies to claims alleging discrimination based on sex, race, religion, color, and national origin as well.").[5] Given the similarly between the federal-sector provision of Title VII and the ADEA, at least two District Judges in this District have applied *Babb*. *See Young v. Wormuth*, 2023 WL 2722616, at *12-13 (E.D. Va. Mar. 30, 2023) ("The Court will follow this approach . . . ."); *Abdelhamid v. Sec'y of Navy*, 525 F. Supp. 3d 671, 684-85 (E.D. Va. 2021) (finding adverse actions that did not qualify as

---

[5] *Cf. Kocher v. Sec'y of Veterans Affairs*, 2023 WL 8469762, at *1 (3d Cir. Dec. 7, 2023) ("Thus, under both the federal-sector provision of the ADEA and Title VII, a personnel action must be made untainted by discrimination." (internal quotation marks omitted)).

12

personnel actions could not support the plaintiff's discrimination or retaliation claims). This Court concurs in the analysis of these well-reasoned opinions that, in light of the similarity between the statutes, the "personnel action" language in the federal-sector provision of Title VII is similarly limiting.

The Court must therefore examine which of Plaintiff's alleged adverse employment actions qualify as personnel actions. "Personnel action" is expressly defined in the CSRA, which details eleven specific actions. *See* 5 U.S.C. § 2302(a)(2)(A).[6] Plaintiff identifies twenty-three alleged adverse actions, many of which do not qualify as personnel actions, including: (i) Plaintiff's complaints about being supervised by the Supervisors; (ii) attempts to transfer Plaintiff which never materialized;[7] (iii) the alleged interrogation regarding an incident; and (iv) the undermining of Plaintiff's authority. *See* Dkt. 44 ¶ 87 (these cover the adverse actions identified as 1, 3-4, 6-11, 13-15). Defendant argues that requiring Plaintiff to complete redeployment training, his working conditions in Kuwait, the restrictions on his access to non-classified information and buildings, and the requirement to undergo a fitness for duty exam also fail to qualify as personnel actions, but at the motion-to-dismiss stage Plaintiff has alleged sufficient facts to plausibly suggest that they fall within Section 2302(a)(2)(ix), (x), and (xii).

---

[6] Those actions are: (i) an appointment; (ii) a promotion; (iii) an action under chapter 75 of this title or other disciplinary or corrective action; (iv) a detail, transfer, or reassignment; (v) a reinstatement; (vi) a restoration; (vii) a reemployment; (viii) a performance evaluation under chapter 43 of this title or under title 38; (ix) a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph; (x) a decision to order psychiatric testing or examination; (xi) the implementation or enforcement of any nondisclosure policy, form, or agreement; and (xii) any other significant change in duties, responsibilities, or working conditions. 5 U.S.C. § 2302(a)(2).

[7] *See West v. Potter*, 540 F. Supp. 2d 91, 96 (D.D.C. 2008) (holding that "an employee faced with a threatened employment action does not suffer a cognizable injury from an action that does not occur").

However, with the exception of Plaintiff's working conditions in Kuwait, Plaintiff has failed to allege facts sufficient to create a plausible inference of race discrimination. As noted *supra*, with respect to many of the alleged personnel actions (such as the fitness for duty exam, the denial of leave, the return to the United States, the restrictions of access, and the administrative leave), Plaintiff has failed to identify any decisionmaker such that the Court could determine whether such individual or group was acting with any animus. With respect to others, Plaintiff offers no non-conclusory facts from which the Court could infer that race was a plausible reason for the action. For example, with respect to requiring Plaintiff to complete re-complete deployment training, Plaintiff does not provide any information regarding his own training or any of the alleged comparators' training. The Court thus has no frame of reference from which to determine whether race was a plausible basis for requiring such training.

Plaintiff's allegations regarding his living and working conditions in Kuwait stand in stark contrast to the rest of Plaintiff's rather conclusory allegations. Plaintiff alleges that, as the RDI in Kuwait, he was denied access to the RDI-designated suite, which included multiple monitors and other equipment necessary for the performance of his job. Dkt. 44 ¶36. Plaintiff further alleges that each of the prior Caucasian RDI stationed in Kuwait (including his immediate predecessor – Day) was permitted to use the suite. *Id.* Finally, Plaintiff alleges that the suite that he was provided was substantially worse in that it contained "no bed linens, contained spoiled food, had known plumbing issues, and had no resources to support the duties of the RDI." *Id.* In this regard, Plaintiff, in reliance on similarly situated comparators, has created an inference of discrimination in this regard. Accordingly, the Motion will be denied in this limited respect.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 47) is GRANTED-IN-PART and DENIED-IN-PART. The Motion is denied only with

respect to the allegations of race discrimination based on unequal working conditions in Kuwait in Count I; the Motion is otherwise granted; and it is

FURTHER ORDERED that Plaintiff is DIRECTED to file any amended complaint within twenty-one (21) days of the entry of this Memorandum Opinion and Order.  Plaintiff is advised that, if Plaintiff fails to file an Amended Complaint by that date, the Court will view Plaintiff as proceeding only with respect to the limited remaining aspect of Count I.

It is SO ORDERED.

Alexandria, Virginia
July 21, 2026

_____ /s/ _____
Rossie D. Alston, Jr.
United States District Judge